IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF MISSISSIPPI
SOUTHERN DIVISION

JOHN FLETCHER; ELENA WEBER;
JERRY WEBER; THOMAS ALFONSO;
ANNE ALFONSO; and ROBERT ESHER           PLAINTIFFS

V.           CAUSE NO. 1:13CV223-LG-JCG

DIAMONDHEAD COUNTRY CLUB
AND PROPERTY OWNERS ASSOCIATION
INC.; MARSHALL KYGER, *in his official
capacity as President of the Diamondhead
Country Club and Property Owners
Association Inc.*; and BOARD OF
DIRECTORS, *in their official capacities*           DEFENDANTS

<u>MEMORANDUM OPINION AND ORDER GRANTING DEFENDANTS'
MOTION FOR SUMMARY JUDGMENT</u>

BEFORE THE COURT is the [107] Motion for Summary Judgment filed by Defendants Diamondhead Country Club and Property Owners Association Inc. ("DPOA") and Marshall Kyger ("Kyger") in his official capacity as President of the DPOA. Having reviewed the submissions of the parties and the relevant law, the Court is of the opinion that Plaintiffs' § 1983 claims against the DPOA fail as a matter of law because the conduct of the Defendants does not constitute "state action."

INTRODUCTION

This action arises out of the DPOA's prohibition on displays of political yard signs and door-to-door solicitation by property owners, including Plaintiffs. Plaintiffs claim that this prohibition violates their First and Fourteenth Amendment rights because the DPOA is a "state actor" since it is "inexorably

intertwined with the City of Diamondhead." (Compl. 1 (¶ 2), ECF No. 1). Plaintiffs also argue that the DPOA is a "company town," as that term has been discussed by the United States Supreme Court. Plaintiffs seek redress of their constitutional rights pursuant to 42 U.S.C. § 1983.

The DPOA argues on summary judgment that it is separate from the City of Diamondhead, and, thus, not a state actor subject to this suit. It also claims that, even if it is a state actor, Plaintiffs waived their constitutional rights. The Court does not reach the issue of waiver, however, because it finds that there is no genuine issue of material fact that the DPOA is not a state actor for purposes of Plaintiffs' § 1983 claims.

## STANDARD OF REVIEW

A motion for summary judgment shall be granted "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In reviewing a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party. *Abarca v. Metro. Transit Auth.*, 404 F.3d 938, 940 (5th Cir. 2005). As movants, Defendants bear the initial burden of identifying those portions of the pleadings and discovery on file, together with any affidavits, which they believe demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). If Defendants carry this burden, the burden shifts to Plaintiffs to show that summary judgment should not be granted. *Id.* at 324-25. Plaintiffs may not rest upon mere allegations in their Complaint but must

set forth specific facts showing the existence of a genuine issue for trial. *Abarca*, 404 F.3d at 940.

Plaintiffs' "burden is not satisfied with some metaphysical doubt as to the material facts, by conclusory allegations, by unsubstantiated assertions, or by only a scintilla of evidence." *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (citations and quotation marks omitted). While the Court is obligated to resolve factual controversies in favor of the non-moving party, it must only do so when there is an actual controversy, "that is, when both parties have submitted evidence of contradictory facts." *Id.* The Court will not, in the absence of proof, assume that the non-moving party could or would prove the necessary facts. *Id.* Finally, "there is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a [factfinder] to return a verdict for that party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). "If the evidence is merely colorable or is not significantly probative, summary judgment may be granted." *Id.* at 249-50 (citations omitted).

## SUMMARY JUDGMENT FACTS

The Court notes that many of Plaintiffs' summary judgment "facts" in response to Defendant's Motion are mere argument of counsel not supported by actual evidence. *See Little*, 37 F.3d at 1075 (unsubstantiated assertions are insufficient to overcome summary judgment); *Chester v. Associates Corp. of N. Am.*, No. 3:97-CV-3186-L, 2000 WL 743679, at *3 (N.D. Tex. May 26, 2000) ("Argument of counsel is not evidence . . . ."). In addition, Defendant's have made several

objections to Plaintiff's summary judgment exhibits. When the argument of counsel is set aside, in the light most favorable to Plaintiff, the relevant facts for summary judgment purposes are as follows:[1]

**Background of the DPOA**

The Diamondhead common interest development ("CID") was first established in 1970. The Master Covenants applicable to the CID prohibit most signs, including political signs, on the residential lots in the CID and have done so since 1970. The DPOA, a private, non-profit corporation, was also incorporated in

---

[1] The Court has considered the DPOA's objections to Plaintiffs' summary judgment exhibits and overrules all objections except as follows:

*Exhibit F*: The Court sustains the DPOA's objections to paragraph 15, but only with respect to the last sentence of that paragraph. That sentence does not contain any factual allegations, but, instead, offers an opinion as to the ultimate issue that this Court is to decide of whether the DPOA and the City essentially act as one body. *See Galindo v. Precision Am. Corp.*, 754 F.2d 1212, 1216 (5th Cir. 1985) ("[U]nsupported allegations or affidavits setting forth 'ultimate or conclusory facts and conclusions of law' are insufficient to either support or defeat a motion for summary judgment.") (citation omitted).

*Exhibit Y*: The Court sustains in part and overrules in part the objection to pages 000369-76 of this exhibit. Plaintiffs state that this exhibit show the financials of the DPOA, including that "approximately $82,000.00 was spent by the POA to incorporate Diamondhead." (Pls.' Mem. 4, ECF. No. 112). For summary judgment purposes, the Court accepts as true that the POA spent approximately $82,000 toward incorporation efforts and the Court overrules the DPOA's objection to the extent pages 000369-76 of this exhibit contain factual evidence related to the DPOA's support of incorporation with member funds. The Court sustains the objection, however, with respect to all other statements in these pages, including the author's speculation as to why the DPOA was supporting incorporation, which would be insufficient to avoid summary judgment anyway. *See Sanches v. Carrollton-Farmers Branch Indep. Sch. Dist.*, 647 F.3d 156, 165 (5th Cir. 2011) ("Conclusional allegations and denials, speculation, and unsupported assertions are insufficient to avoid summary judgment.").

1970 and its membership is composed of the incorporators and the owners and purchasers of lots in the Diamondhead CID. For purposes of this Motion, the DPOA concedes that the majority of residents in the City of Diamondhead (including Plaintiffs) live in the CID and are subject to the Master Covenants. Moreover, in addition to the Master Covenants, the DPOA has adopted rules for residents in the Diamondhead CID, which include a general rule in effect since 1989 prohibiting door-to-door solicitation.

In 1984, the Diamondhead CID conveyed to the DPOA ownership of its common amenities (including a country club, golf course, tennis courts, pools, a marina, and an airport) and the DPOA continues to operate and maintain these amenities. In 1989, the DPOA was also given the power to enforce the restrictive covenants applicable to the residential lots within the Diamondhead CID and continues to have that power through today. The DPOA's main purpose is to maintain the amenities and enforce the covenants.

The DPOA does not provide electric, water, sewage, or garbage disposal services to residents in the Diamondhead CID. It does not have a police or fire department and does not maintain any public property except for a small green space adopted pursuant to the City of Diamondhead's Adopt-a-Right-of-Way program. The DPOA does not own, operate, or maintain any water or sewage treatment facility, public school, library, or any type of church or chapel. There is no business area, commercial district, or post office in the Diamondhead CID.

Case 1:13-cv-00223-LG-JCG Document 119 Filed 10/27/14 Page 6 of 18

**Incorporation of the City of Diamondhead**

The City of Diamondhead ("the City") incorporated in 2012. Prior to that time, in 2004, the City of Bay St. Louis had proposed to annex a part of Hancock County that included a portion of the Diamondhead CID, but ultimately did not do so. As a result, however, during the period 2004-2006, DPOA Board President Lloyd Ramirez commissioned a study of the merits of annexation versus incorporation of Diamondhead as a separate city. Ramirez subsequently published four articles concerning incorporation in the *Diamondhead News*. In June 2006, DPOA members voted on a non-binding resolution to determine the level of support for incorporation, with 2/3 of the votes cast in support of incorporation.

In mid-2006, the DPOA established the Government Information Committee whose mission was to discharge the DPOA's fiduciary responsibility to protect DPOA property and amenities, and their value, by determining whether the DPOA should support annexation or incorporation. The DPOA spent approximately $32,000 to fund the study. After obtaining input from multiple sources, including an urban planning consultant and legal counsel, the Government Information Committee reported to the DPOA Board that incorporation was preferred to annexation in terms of protecting and preserving the DPOA's assets. The Committee then dissolved in 2007.

Thereafter, in mid-2007, an Incorporation Committee was formed to inform residents of the findings of the Government Information Committee's study. The DPOA did not create the Incorporation Committee, although it did allow the


committee to use DPOA facilities for town hall meetings, office space, and copying and telephone usage and, according to Plaintiffs, many DPOA officials also served on that Committee. The DPOA provided the Incorporation Committee with up to $50,000 toward the fees and other expenses required to inform and educate voters to make informed decisions with respect to incorporation. After obtaining the necessary petition signatures required for incorporation, the Incorporation Committee submitted the petition for incorporation to the Mississippi Secretary of Sate, who approved incorporation effective January 30, 2012.

The Incorporation Committee nominated interim City officials who took office when the City was established. According to Plaintiffs, the boundaries of the Diamondhead CID and the City are nearly identical. The new City also adopted the name of the CID, Diamondhead, and shares a logo with the DPOA. Because the City did not have City Hall facilities ready for use upon incorporation, the City entered into a short-term lease of office space owned by the DPOA. The City paid the DPOA rent of $750 per month plus a separate utility charge until it moved into its new City Hall facilities and terminated the lease in early 2013. Since then, the City has not shared any office space with the DPOA or leased office space from the DPOA. According to Plaintiffs, the DPOA and the City also shared a website at some point and, at least as of May 2013, a recorded message at the DPOA offices directed persons to call a separate number to reach the City.

Unlike the DPOA's Master Covenants, the City's zoning ordinances include a sign ordinance which allows residents to place political signs on their private

7

property. The City does not enforce the DPOA's Master Covenants and rules and the DPOA's employees are paid by the DPOA, not the City. No DPOA Officer or Director is allowed to serve concurrently on the DPOA Board and the City's governing body, although Plaintiffs claim that many of the interim City officials also held important DPOA offices.

In June 2013, Thomas Schafer, a member of the DPOA Board, was elected mayor of Diamondhead in the City's first general elections and resigned his Board position. There is no genuine dispute that Schafer, not Chuck Ingraham, is the current City mayor. While Plaintiffs state that the mayor is currently listed on the DPOA's website as a member of the Board, there is no evidentiary support for this statement and the actual evidence shows otherwise. Likewise, while Plaintiffs state that several current City Council members hold positions in the POA, there is no evidence in the record to support this proposition.

## DISCUSSION

Initially, the Court notes that the Board of Directors did not move for summary judgment, although throughout their submissions the parties treat all Defendants interchangeably. Regardless, neither Kyger nor any Board members are sued in their individual capacities. The Court finds that the official capacity claims against Kyger and the Board are redundant of the claims against DPOA and, accordingly, are due to be dismissed. *See Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated

as a suit against the entity."); *Fennell v. Marion Indep. Sch. Dist.*, No. SA:12-CV-00941-DAE, 2013 WL 321880, at *5 (W.D. Tex. Jan. 28, 2013) (dismissing § 1983 official capacity claims against individual defendants as redundant).

The parties agree that Plaintiffs' First and Fourteenth Amendment claims, brought pursuant to 42 U.S.C. § 1983, require "state action." *See Becerra v. Asher*, 105 F.3d 1042, 1045 (5th Cir. 1997). Plaintiffs argue that the DPOA is a state actor under a "company town" theory and a "pervasive entwinement" theory. The DPOA argues that it is not a state actor under either theory and, further, that Plaintiffs waived any constitutional rights they may have had. The Court agrees with the DPOA that it is not a state actor, and, thus, is not subject to suit under § 1983.

**I.      The DPOA is not a company town.**

In *Marsh v. Alabama*, 326 U.S. 501 (1946), the United States Supreme Court found that a private citizen had a First Amendment and Fourteenth Amendment right to distribute religious literature on the premises of a company-owned town. In doing so, the Court determined that the company-owned town was no different from a non-company-owned town (*i.e.*, a state actor) because, except for its ownership, the town had "all the characteristics of any other American town[, including] residential buildings, streets, a system of sewers, a sewage disposal plant and a 'business block' on which business places [we]re situated." *See id.* at 502-03.

Subsequently, the Supreme Court clarified that state action can only be found under the authority of *Marsh* where a private enterprise, such as the DPOA,

assumes "all of the attributes of a state-created municipality[,]" exercises "semiofficial municipal functions as a delegate of the State[,]" and is, thus, in effect, "performing the full spectrum of municipal powers and st[anding] in the shoes of the State." *Lloyd Corp. v. Tanner*, 407 U.S. 551, 569 (1972); *see also United Auto Workers, Local No. 5285 v. Gaston Festivals, Inc.*, 43 F.3d 902, 909 (4th Cir. 1995). Applying this law, the Fifth Circuit has held that a company-owned migrant worker camp was a company town where it "consisted of residential areas, streets, a store, eating facilities, a post office, and even a chapel" and "was a self-contained community in which municipal services were afforded" for its residents "from fire protection and postal services to sewage, garbage disposal, and electric services." *Petersen v. Talisman Sugar Corp.*, 478 F.2d 73, 82 (5th Cir. 1973).

The Court finds that under the controlling authority the DPOA is not a company town. The DPOA carried its burden of showing that it does not perform major municipal functions such as police protection, fire protection, utility services, or operation of one or more public schools, and Plaintiffs have failed to create a genuine issue of material fact with respect to this issue. *Cf. Cable Assocs., Inc. v. Town & Country Mgmt. Corp.*, 709 F. Supp. 582, 589 (E.D. Pa. 1989) (rejecting plaintiffs' company town analogy because although the defendant had "undertaken some municipal functions, the major municipal functions of police protection, fire protection, school and general municipal powers" were not performed by defendant).

The Court is not persuaded by Plaintiffs' argument that "there is little question that large, mix-used residential community associations qualify as state

actors under *Marsh*." The Court has reviewed the law review article Plaintiffs cite in support of their argument. *See* Steven Siegel, *The Constitution and Private Government: Toward the Recognition of Constitutional Rights in Private Residential Communities Fifty Years After Marsh v. Alabama*, 6 Wm. & Mary Bill Rights J. 461 (1998). However, of the two large, mix-used residential community associations discussed in the article, one had twenty-one churches, four shopping centers, eight public schools, and a sewage treatment plan and the other had ten shopping centers and operated parks, libraries, and a fire department. Those facts are not analogous to those here.

Finally, Plaintiffs do not cite and the Court has found no binding authority holding that because almost all residential homes in a city are part of a property owners' association, that association is automatically a company town. More is required under *Marsh* and its progeny, such as control of businesses. Here, Plaintiffs admit that the City's business district is not DPOA property. The undisputed facts in this action are not akin to those in *Marsh* or *Peterson*. Because Plaintiffs have not met their burden of showing that there is a genuine issue of material fact for trial on their "company town" theory of state action, the Court finds that Defendants are entitled to summary judgment on this issue.

**II.    The DPOA is not overborne by pervasive entwinement of the City.**

"[S]tate action may be found if, though only if, there is such a close nexus between the State and the challenged action that seemingly private behavior may

be fairly treated as that of the State itself." *Brentwood Acad. v. Tenn. Secondary Sch. Athletic Ass'n*, 531 U.S. 288, 295 (2001) (citation and quotation marks omitted). The question for the Court, then, is whether it can fairly be said that the City of Diamondhead is responsible for the DPOA's conduct about which Plaintiffs complain. *See id.*; *Cornish v. Corr. Servs. Corp.*, 402 F.3d 545, 549 (5th Cir. 2005) (the critical inquiry with respect to the state action analysis is whether the alleged infringement of federal rights can be "fairly attributable to the State") (citation and quotation marks omitted). "Restated, mere private conduct, no matter how discriminatory or wrongful, is excluded from § 1983's reach." *Cornish*, 402 F.3d at 549 (citation, quotation marks, and brackets omitted).

A private association will be considered a state actor where the nominally private character of the association "is overborne by the pervasive entwinement of . . . public officials in its composition and workings . . . ." *Id.* Thus, the touchstone of the "pervasive entwinement" test is control, *i.e.*, whether a state actor (here, the City) is so entwined in the management and decisions of the private entity (here, the DPOA) that the actions of the private entity should in actuality be attributed to the State. *See Rundus v. City of Dallas*, No. 3-06-CV-1823-BD, 2009 WL 2971771, at *6 (N.D. Tex. 2009), *aff'd*, 634 F.3d 309, 316 (5th Cir. 2011). Relevant considerations include: whether the association is mostly comprised of public institutions (or in this case public officials); whether public officials dominate decision making; whether the organization's funds are largely generated by public

institutions; and whether the association is acting in lieu of a traditional state actor. *See Adkins v. Fountainbleau Mgmt. Servs., LLC*, No. 1:08CV257-M-D, 2010 WL 786301, at *2 n.1 (N.D. Miss. Mar. 3, 2010).

Here, construing all doubts in their favor, the Court finds that Plaintiffs have failed to create a genuine issue of material fact with respect to whether the City is so entwined in the management and decisions of the DPOA that the DPOA's actions in prohibiting political signs and solicitations are fairly attributable to the City. Not only is there no issue of fact that the City is not responsible for enforcement of the DPOA's Master Covenants and rules, but the City's ordinances also actually *allow* what the DPOA's Master Covenants prohibit. This fact certainly weighs heavily against finding that the DPOA's action should be "fairly treated" as that of the City. *See Brentwood*, 531 U.S. at 295; *see also Tomialo v. Mallinoff*, 281 F.3d 1, 9 (1st Cir. 2002) ("Also lacking is any evidence that the government is the real actor behind a private facade, joining in a charade designed to evade constitutional prohibitions.").

Similarly, the fact that City Council members and a POA representative worked together to identify City needs to report to government emergency agencies after Hurricane Isaac does not indicate such "pervasive entwinement" that the DPOA and City can be held indistinguishable for purposes of state action with respect to enforcement of the DPOA's political sign and solicitation restrictions. *See Brentwood*, 531 U.S. at 295; *see also Everett-Dicko v. Ogden Entm't Servs., Inc.*, 36

F. App'x 245, 249 (9th Cir. 2002) ("Under *Brentwood*, entwinement occurs when structural overlap between private and public defendants exists, not when parties simply work together.").

Plaintiffs cite no legal authority for their argument that the DPOA's involvement in, and support (including financial) of incorporation translated to "pervasive entwinement" once the City incorporated.  The DPOA is a private entity who was free to take a stand on the issue of incorporation versus annexation and its support of incorporation does not establish that the DPOA's action should now be considered the City's.  That the City rented office space from the DPOA for a short period does not rise to the level of control of the DPOA by the City required by *Brentwood*.  Plaintiffs do not dispute that the City was paying for the space, just like it would have paid to rent the space from any other property owner.

Furthermore, considering the facts above together with Plaintiffs' claims (1) that the DPOA and City share similar boundaries and the same name and logo; (2) that the DPOA and the City shared a website at some point; (3) that a recorded message allegedly from May 19, 2013 directed persons to call an entirely separate number to reach the City; and  (4) that the POA has not transferred all "services" to

the City[2] still does not move the Court to conclude that the City exercises sufficient control over the DPOA such that this Court can say that the City is responsible for the DPOA's political sign and solicitation prohibitions. While the Court is aware of the fact that almost all City residents live within the CID and are subject to the DPOA Master Covenants and rules (just as they were before the City was incorporated), similar boundaries and the other facts alleged by Plaintiffs do not automatically convert private action into state action, and Plaintiffs have not directed this Court to any authority that would compel such a holding.

Rather, the *Brentwood* analysis focuses on whether the DPOA is overborne by the pervasive entwinement of City officials in its *composition and workings*. 531 U.S. at 298. Plaintiffs claim that several City officials (such as Chuck Ingraham, the interim City mayor) were members of the Government Affairs Committee and/or the Incorporation Committee. First, there is no dispute that the DPOA's Government Affairs Committee was dissolved in 2007 (five years before incorporation) or that the Incorporation Committee was not created by the DPOA. Second (and even accepting Plaintiffs' unsupported argument that the Incorporation

---

[2] Plaintiffs claim that "[i]n 2008, during the incorporation process, the POA approached the incorporation committee with a plan to transfer POA run services to the city prior to 2020, when they expected the covenants to expire." (Pls.' Mem. 9, ECF No. 112). Plaintiffs' citation to Exhibit D (ECF No. 111-4) does not support this statement. Rather, it appears that the DPOA contemplated transferring the DPOA-owned *amenities* to the City in 2020, not that the DPOA was performing municipal services. Even so, the only "services" identified by Plaintiffs relate to streets and drainage, and there is no genuine dispute that the City, not the DPOA, is in charge of these and other municipal services.

Committee was part of the DPOA), the fact that a City official may have been on the DPOA Board or a DPOA Committee prior to incorporation does not persuade the Court that the City and the DPOA are so pervasively entertwined now that the City should be held responsible for the DPOA's actions. The Court finds unconvincing and unsupported Plaintiffs' arguments regarding committee membership by City officials before incorporation.

There is no evidence of a significant overlap between the DPOA Board and the City governing body since the City's incorporation (*i.e.*, composition) and that the City officials were involved in running the DPOA and enforcing its political sign and solicitation prohibition (*i.e.*, workings). Taking as true Plaintiffs' statements and argument that many of the interim City officials appointed by the Incorporation Committee also held important POA offices, Plaintiffs do not dispute that at least since the City's first municipal general elections in June 2013, no City official has served concurrently on the City and the DPOA.

Moreover, even if Plaintiffs were able to demonstrate a significant overlap in the composition of the DPOA and the City's governing bodies, mere service by a

DPOA Board member as a City official is not be enough.[3] Plaintiffs have yet to come forward with evidence on summary judgment that an overlapping City official dominated DPOA decision making such that the DPOA's actions could be fairly attributed to the City. *See Adkins*, 2010 WL 786301, at *2 n.1; *see also Brentwood*, 531 U.S. at 298.

In sum, the factors argued by Plaintiffs, taken together, simply do not show pervasive entwinement under *Brentwood*. Accordingly, the DPOA is not a state actor and cannot be sued under § 1983.

## CONCLUSION

Plaintiffs' § 1983 claims against the DPOA necessarily fail because the DPOA is not a state actor. Because Kyger and the DPOA Board members are sued in their official capacity only, the claims against them are also dismissed.[4]

**IT IS THEREFORE ORDERED AND ADJUDGED** that the [107] Motion

---

[3] The evidence cited by Plaintiffs does not support their statements related to *ex officio* Board positions. Even if it did, Plaintiffs themselves acknowledge the law that the presence of *ex officio* members, without more, does not equate to state action. *See, e.g.*, *Madry v. Sorel*, 558 F.2d 303, 305-06 (5th Cir. 1977) ("Our decision in this case might be very different if there was some indication that the ex officio members had some purpose other than a ceremonial one, and that they actually participated to some extent in the running on the hospital. Absent such an allegation by the plaintiff, we are not willing to confine the actions of an otherwise private hospital to the restraints of the Fourteenth Amendment."). To the extent Plaintiffs' *ex officio* argument relates to the DPOA's Government Information Committee, there is no dispute that that Committee was not in existence when the City was incorporated.

[4] Because the Court finds that Plaintiffs cannot establish the threshold requirement of "state action," it does not address the parties' waiver arguments.

for Summary Judgment filed by Defendants Diamondhead Country Club and Property Owners Association Inc. and Marshall Kyger in his official capacity as President of the DPOA is **GRANTED**.

    **IT IS FURTHER ORDERED AND ADJUDGED** that this action is **DISMISSED WITH PREJUDICE**.

    **SO ORDERED AND ADJUDGED** this the 27th day of October, 2014.

                                                 s/ *Louis Guirola, Jr.*
                                                 LOUIS GUIROLA, JR.
                                                 CHIEF U.S. DISTRICT JUDGE